ANTHONY M. BARNES, SBN 199048
Email: amb@atalawgroup.com
JASON R. FLANDERS, SBN 238007
Email: jrf@atalawgroup.com
AQUA TERRA AERIS (ATA) LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Telephone: (917) 371-8293

ERIN K. CLANCY, SBN 249197
Email: erin@cacoastkeeper.org
CALIFORNIA COASTKEEPER ALLIANCE
1100 11th Street, 3rd Floor
Sacramento, CA 95814
Telephone: (619) 313-3037

*Attorney for Plaintiffs*
CALIFORNIA COASTKEEPER, INC., dba
CALIFORNIA COASTKEEPER ALLIANCE, and
THE OTTER PROJECT, INC., for itself and for
MONTEREY COASTKEEPER, a program of
THE OTTER PROJECT, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA COASTKEEPER, INC., doing business as CALIFORNIA COASTKEEPER ALLIANCE, a nonprofit corporation, and THE OTTER PROJECT, INC., for itself and for MONTEREY COASTKEEPER, a program of THE OTTER PROJECT, INC., a nonprofit corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> HILDEBRAND & SONS TRUCKING, INC., <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

CALIFORNIA COASTKEEPER, INC., doing business as CALIFORNIA COASTKEEPER

ALLIANCE ("CCKA"), THE OTTER PROJECT, INC., for itself and for MONTEREY

COASTKEEPER, a program of THE OTTER PROJECT, INC. ("TOP") (collectively, "Plaintiffs"), by and through their counsel of record, hereby allege as follows:

## I.   JURISDICTION AND VENUE.

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA").  (*See* 33 U.S.C. § 1365.)  This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On August 15, 2020, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Hildebrand & Sons Trucking, Inc. ("Defendant"), for the industrial facility in Royal Oaks, California, under its control.  The Notice Letter informed Defendant of its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ*), as superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122–DWQ (hereinafter referred to as the "Storm Water Permit), and the Clean Water Act at Defendant's commercial trucking facility located 6 Lewis Road Royal Oaks, CA 95076 ("Facility").  The Notice Letter informed Defendant of Plaintiffs' intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

3.      The Notice Letter was sent to Defendant's President and registered agent for service of process, Kelvin Hildebrand, as required by 40 C.F.R. § 135.2(a)(2). The Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Central Coast Regional Water Quality Control Board ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

4.      More than sixty (60) days have passed since the Notice Letter was served on the Defendant and the State and Federal agencies.  Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action

1  to redress the violations alleged in the Notice Letter and in this complaint.  (*See* 33 U.S.C. §

2  1365(b)(1)(B).)  This action is not barred by any prior administrative penalty under Section 309(g) of

3  the CWA, 33 U.S.C. § 1319(g).

4      5.    Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of

5  the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial

6  district.

7  **II.**    **INTRODUCTION.**

8      6.    With every rainfall event, hundreds of millions of gallons of polluted rainwater,

9  originating from industrial operations such as the Facility referenced herein, pour into storm drains

10  and local waterways. The consensus among regulatory agencies and water quality specialists is that

11  storm water pollution accounts for more than half of the total pollution entering marine and river

12  environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive

13  areas.  Although pollution and habitat destruction have drastically diminished once abundant and

14  varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as

15  macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment,

16  heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as,

17  high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms

18  the special aesthetic and recreational significance that the surface waters have for people in the

19  surrounding communities. The public's use of the surface waters exposes many people to toxic metals

20  and other contaminants in storm water and non-storm water discharges. Non-contact recreational and

21  aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the

22  Receiving Waters.

23      7.    This Complaint seeks a declaratory judgment, injunctive relief, the imposition of civil

24  penalties, and the award of costs, including attorney and expert witness fees, for Defendant's

25  substantive and procedural violations of the Storm Water Permit and the CWA resulting from

26  Defendant's operations at the Facility.

27  / / /

28

8.      Plaintiffs specifically allege violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.   PARTIES.

### A.   The Plaintiffs.

9.      California Coastkeeper Alliance is a non-profit public benefit organization dedicated to protecting California's coasts and oceans. The Otter Project, Inc., is a non-profit public benefit organization working to protect our watersheds and coastal oceans for the benefit of California's Southern Sea Otters and humans through science-based policy and advocacy.  Monterey Coastkeeper is a program of the Otter Project, Inc., and a participant in the California Coastkeeper Alliance. These three organizations shall collectively be known as "The Plaintiffs." The members of these organizations reside in the communities adjacent to the Pajaro River (the "Receiving Waters") into which the Defendant indirectly discharges polluted storm water.  As explained in detail below, the Defendant continuously discharges pollutants into the Receiving Waters, in violation of the Clean Water Act and the Storm Water Permit. The Plaintiffs' members picnic, fish, hike, bike, and enjoy the wildlife of the Pajaro River and the estuary of the Monterey Bay.  Additionally, the members use the Receiving Waters to engage in scientific study through pollution and habitat monitoring to promote restoration activities. The unlawful discharge of pollutants from the Facility into the Receiving Waters impairs the Plaintiffs' members' use and enjoyment of these waters. Thus, the interests of the members have been, are being, and will continue to be adversely affected by the Defendant's failure to comply with the Clean Water Act and the Storm Water Permit.

10.      Plaintiffs are dedicated to the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California. To further these goals, Plaintiffs are actively seeking federal and state agency implementation of the Clean Water Act and other laws and, where necessary, directly initiating citizen enforcement. As referenced herein, members of Plaintiffs use and enjoy the Receiving Waters herein into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Defendant's discharges of pollutants threaten

1  or impair each of those uses or contribute to such threats and impairments. Thus, the interests of

2  Plaintiffs' members have been, are being, and will continue to be adversely affected by Defendant's

3  ongoing failure to comply with the Clean Water Act and/or the Storm Water Permit. The relief sought

4  herein will redress the harms to Plaintiffs caused by Defendant's activities.

5      11.    Defendant's failure to comply with the procedural and substantive requirements of the

6  Storm Water Permit and/or the Clean Water Act, including but not limited to Defendant's discharge

7  of polluted stormwater and non-stormwater from the Facility, negatively impacts and impairs

8  Plaintiffs' members' use and enjoyment of these waters.

9      12.    Continuing commission of the acts and omissions alleged herein will irreparably harm

10  Plaintiffs' members, for which they have no plain, speedy, or adequate remedy at law.

11      **B.    The Defendant.**

12      13.    Plaintiffs are informed and believe, and thereon allege, that the Defendant is the owner

13  and operator of the Facility located at 6 Lewis Road, Royal Oaks, CA 95076.

14      14.    Plaintiffs are informed and believe, and thereon allege, that the Defendant is an active

15  California corporation, registered with the California Secretary of State as File Number C0329309.

16  **IV.   <u>STATUTORY BACKGROUND.</u>**

17      **A.    The Clean Water Act.**

18      15.    Section 301(a) of the CWA prohibits the discharge of any pollutant into waters of the

19  United States unless the discharge complies with various enumerated sections of the CWA. Among

20  other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a

21  National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402

22  of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

23      16.    Section 402(p) of the CWA establishes a framework for regulating municipal and

24  industrial storm water discharges under the NPDES program. (33 U.S.C. § 1342(p).) States with

25  approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water

26  discharges through individual permits issued to dischargers and/or through the issuance of a single,

27  statewide general permit applicable to all industrial storm water dischargers. (33 U.S.C. § 1342.)

28  / / /

17.     Section 301(b) of the CWA requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. (*See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).)

18.     The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. (33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).)

19.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." (33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.)

20.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." (33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.)

21.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." (33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.)

22.     "Navigable waters" means "the waters of the United States." (33 U.S.C. 1362(7).)

23.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." (33 U.S.C. § 1362(7).)

24.     The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." (40 C.F.R. § 122.2.) The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

25.     The CWA confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the

navigable water. (*See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).)

26. A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." (*Id.,* at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.)

27. A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. (*Id.,* at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.)

28. Section 505(a)(1) and Section 505(f) of the CWA provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." (*See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).)

29. The Defendant is "person[s]" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

30. An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

31. Pursuant to sections 309(d) and 505 of the CWA, each separate violation of the CWA occurring before November 2, 2015 subjects the violator to a penalty of up to $37,500 per day; violations occurring after November 2, 2015 and assessed on or after January 15, 2018 subjects the violator to a penalty of up to $53,484 per day. (*See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4)(Adjustment of Civil Monetary Penalties for Inflation).)

32. Section 505(d) of the CWA, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.    California's Storm Water Permit.**

33. Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including

1   discharges of polluted storm water.  States with approved NPDES permit programs are authorized by

2   Section 402(b) to regulate industrial storm water discharges through individual NPDES permits

3   issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to

4   all industrial storm water dischargers. (*Id.*)

5        34.    Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA

6   has authorized California to issue NPDES permits, including general NPDES permits. California has

7   designated the State Board and the Regional Water Quality Control Boards to administer its NPDES

8   program. (*City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th

9   1377, 1380-81 (2006).) In California, the State Board is charged with regulating pollutants to protect

10  California's water resources. (*See* Cal. Water Code § 13001.)

11       35.    The Storm Water Permit is a statewide general NPDES permit issued by the State

12  Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25.

13  Violations of the Storm Water Permit are also violations of the CWA.  (Storm Water Permit, Section

14  XXI(A).)

15       36.    Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality

16  Standards, including water quality objectives and beneficial uses for navigable waters of the United

17  States.  The CWA prohibits discharges from causing or contributing to a violation of such state Water

18  Quality Standards.   (*See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§

19  122.44(D)(1).)

20       37.    Under the applicable EPA regulations all surface and ground waters of the State of

21  California are considered to be suitable, or potentially suitable, for municipal or domestic water

22  supply and should be so designated by the Regional Boards unless a strict use attainability analysis is

23  performed based upon a structured scientific assessment of the factors affecting the attainment of uses

24  specified in Section 101(a)(2) of the CWA (the so called "fishable/swimmable" uses). (40 CFR

25  131.10(a) and (g).)

26       38.    The State Board elected to issue a statewide general permit for industrial discharges.

27  The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm

28

Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

39.     On July 1, 2015, the operative Storm Water Permit became effective and was issued as NPDES General Permit No. CAS000001 (the same NPDES permit number as the 1997 Permit). Storm Water Permit, Section I(A) (Finding 4). The Storm Water Permit superseded the 1997 Permit except for enforcement purposes. (*Id.*, at Section I(A) (Finding 6).) The substantive requirements of the Storm Water Permit are the same or more stringent than the requirements of 1997 Permit.

40.     On November 6, 2018, the State Board issued an amended but not yet adopted Order No. 2015-0122-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Amendment").

41.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit.  (Storm Water Permit, Section I(A) (Findings 8, 12).)  Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board.  (*See* Storm Water Permit, Section I(A) (Finding 17), Section II(B).)

42.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation."  (*See* 33 U.S.C. §§ 1365(a)(i), 1365(f).)

**C.     The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

43.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States.  (Storm Water Permit, Discharge Prohibition III(B).)

44.     Effluent Limitation V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others.  Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

45.     Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

46.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution.  (33 U.S.C. § 1311(b); Storm Water Permit, Effluent Limitation V(A).)  EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards.  (*See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).)

47.     The EPA established Parameter Benchmark Values for the following parameters, among many others: total suspended solids ("TSS") - 100 mg/L; oil & grease ("O&G") - 15 mg/L; total organic carbon ("TOC") - 110 mg/l; aluminum ("Al") - 0.75 mg/l; iron ("Fe") - 1 mg/l; copper ("Cu") - 0.0123 mg/l; zinc ("Zn") - 0.11 mg/L; pH - 6-9 s.u.; and nitrate & nitrite nitrogen ("N+N") - 0.68 mg/L. The Water Quality Control Plan for the Central Coastal Basin, which covers the region in which the Facility is located, requires a narrower pH range of 7.0 – 8.5 for all inland surface waters, enclosed bays and estuaries, marine habitat, cold fresh water habitat, and warm fresh water habitat, and 6.5 - 8.3 pH units for most beneficial uses including municipal and domestic supply, water contact recreation, non-contact water recreation, and agricultural supply. The Storm Water Permit contains

Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmark Values. (Storm Water Permit, Section I(M) (Finding 62).)

48.     Receiving Water Limitation VI(B) of the Storm Water Permit prohibits storm water discharges from adversely impacting human health or the environment. Further, discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

49.     Receiving Water Limitation VI(A) of the Storm Water Permit prohibits storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

50.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA, to be protective of the beneficial uses of the waters that receive polluted discharges.

51.     The State of California regulates water quality through the State Board and the nine Regional Boards.  Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

52.     As referenced in ¶47, *supra*, the State Water Quality Control Board has issued the Water Quality Control Plan for the Central Coastal Basin ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan states that "[a]ll waters shall be maintained free of toxic substances in concentrations which are toxic to, or which produce detrimental physiological responses in, human, plant, animal, or aquatic life." (Basin Plan, 3.3.2.1.) The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. (Basin Plan, Tables 3-1 - 3-4.) The Basin Plan decrees that waters shall not contain chemical constituents, discoloration, substances, or floating material in concentrations that cause nuisance or adversely affect beneficial uses. (Basin Plan, 3.3.2.1.)

53.     In addition to the *de facto* beneficial uses of swimming and fishing applicable to the Receiving Waters herein (*see* 40 CFR 131.10(a) and (g)), the Basin Plan also identifies present and potential beneficial uses for various hydrologic units leading to the Pajaro River Basin, with municipal

and domestic supply, agricultural supply, industrial process supply, industrial service supply, groundwater recharge, fresh water replenishment, navigation, hydropower generation, water contact recreation, non-contact water recreation, commercial and sport fishing, aquaculture, warm fresh water habitat, cold fresh water habitat, inland saline water habitat, estuarine habitat, marine habitat, wildlife habitat, preservation of biological habitats of special significance, rare, threatened or endangered species migration of aquatic organisms, spawning, reproduction and/or early development, and shellfish harvesting. (Basin Plan, 2.1.)

54.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan – including the Pajaro River Basin - or deemed on a case-by-case basis, would be designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act.

55.     According to the 2016 303(d) List of Impaired Water Bodies, the Pajaro River is listed for Chlordane, Chloride, Chlorpyrifos, Chromium, DDD (Dichlorodiphenyldichloroethane), DDE (Dichlorodiphenyldichloroethylene), DDT (Dichlorodiphenyltrichloroethane), Diazinon, Fecal Coliform, Nitrate, Oxygen (Dissolved), PCBs (Polychlorinated biphenyls), pH, Sedimentation/Siltation, Sodium, Toxicity, and Turbidity. Thus, the Receiving Waters for pollution from the Facility are impaired, and the Defendant's illegal discharges of pollutants above the WQS contributes to the continued impairment of the beneficial uses in the watershed.

56.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. (65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.)

57.     The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[1]

58.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. (*See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000).)

---

[1] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* Storm Water Permit, Attachment H at 18.

59.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Section VI(A) of the Storm Water Permit.

**D.      The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

60.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin.  (Storm Water Permit, Sections I(I) (Finding 54), X(B).) The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. (Storm Water Permit, Section X(G).) The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. (Storm Water Permit, Section X(G).)  The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. (Storm Water Permit, Section X(H).) The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. (Storm Water Permit, Section I(D) (Finding 32), Section X(C).)

61.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. (Storm Water Permit, Section X.)

62.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify

1   and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce

2   or prevent the discharge of polluted storm water from industrial facilities. (Storm Water Permit,

3   Section X.)

4        63.   The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual

5   basis and revise it as necessary to ensure compliance with the Storm Water Permit.  (Storm Water

6   Permit, Section X(A)(9).)  The Storm Water Permit also requires that the discharger conduct an annual

7   comprehensive site compliance evaluation that includes a review of all visual observation records,

8   inspection reports, and sampling and analysis results, a visual inspection of all potential pollutant

9   sources for evidence of, or the potential for, pollutants entering the drainage system, a review and

10  evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and

11  maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to

12  implement the SWPPP.  (Storm Water Permit, Section XV.)

13       64.   The Storm Water Permit also requires that the discharger submit an evaluation report

14  that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s),

15  necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-

16  compliance and the corrective actions taken, and a certification that the discharger is in compliance

17  with the Storm Water Permit. (Storm Water Permit, Section A(9)(d)(i)-(vi).) If certification of

18  compliance cannot be provided, the discharger must explain in the evaluation report why the facility

19  is not in compliance with the Storm Water Permit.  (*Id*., Section A(9)(d).) The evaluation report shall

20  be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. (*Id*.)

21       65.   The SWPPP and site maps must be assessed annually and revised as necessary to

22  ensure accuracy and effectiveness. (Storm Water Permit, Sections I(J) (Finding 55), X(B)(1).)

23  Significant SWPPP revisions must be certified and submitted by the discharger via SMARTS within

24  30 days.  (Storm Water Permit, Section X(B)(2).)  Dischargers are required to submit revisions to the

25  SWPPP that are determined to not be significant every three (3) months in the reporting year.[2] (*Id.* at

26  Section X(B)(3); Storm Water Permit, Fact Sheet, Section II (I)(1).)

27  / / /

28

---

[2] A reporting year under the Storm Water Permit is July 1 to June 30.

E.      **The Storm Water Permit's Monitoring and Reporting Requirements.**

66.     The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). The MIP must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. (*Id.* at Section B(2).) The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. (*Id.*)

67.     The objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. (Storm Water Permit, Section XI.)

68.     The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. (*Id.*)

69.     The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. (Storm Water Permit, Sections I(J) (Findings 55-56) and XI.)

70.     Section XI(A)(4) of the Storm Water Permit requires that the MIP be revised as necessary to ensure compliance with the Storm Water Permit.

71.     Section XI(A) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges.

72.     Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges.  (*See* Storm Water Permit, Section XI(A)(3).)  The Storm Water Permit also requires dischargers to revise the

1  SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at

2  the facility.  (Storm Water Permit, Section X(B)(1).)

3       73.    The Storm Water Permit requires dischargers to visually observe and collect samples

4  of storm water discharges from all locations where storm water is discharged.  (Storm Water Permit

5  Section XI(B)(4).)

6       74.    Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event

7  produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with

8  no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

9       75.    Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze

10  storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to

11  December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June

12  30).  Dischargers are required to submit the storm water sample analyses to the State Board and

13  Regional Board.

14       76.    Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm

15  water samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-

16  specific basis that serve as indicators of the presence of all industrial pollutants identified in the

17  pollutant source assessment, additional applicable industrial parameters related to receiving waters

18  with 303(d) listed impairments or approved TMDLs, and additional parameters required by the

19  Regional Water Board.

20       77.    Section XVI of the Storm Water Permit requires dischargers to submit an annual report

21  with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed

22  all applicable requirements of the Storm Water Permit, an explanation for any non-compliance of

23  requirements within the reporting year, as indicated in the Compliance Checklist, an identification,

24  including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting

25  year, and the date(s) of the Annual Evaluation.

26       78.    Section XII(C) of the Storm Water Permit requires a discharger to execute a Level 1

27  Exceedance Response Actions ("ERA") Evaluation and prepare a Level 1 ERA Report should they

28  exceed a Numeric Action Level ("NAL") for any required sampling and analysis parameter under the

Storm Water Permit, or a Level 2 ERA and prepare a Level 2 ERA Report should they exceed a NAL for two consecutive two consecutive reporting years, for any required sampling and analysis parameter under the Storm Water Permit The ERA Evaluation should identify additional BMPs and SWPPP revisions needed to prevent future NAL exceedances and comply with the Storm Water Permit.  Based upon the ERA Evaluation(s), the discharger shall as soon as practicable, but not later than January 1,  submit an ERA Report and certify that the ERA Report includes: 1) a summary of the ERA Evaluation, 2) a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. Level 2 ERA report requirements are more stringent than a Level 1 ERA report.

## V.      **STATEMENT OF FACTS.**

### A.      **The Facility Site Description.**

79.      The Defendant operates an industrial facility located at 6 Lewis Road, Royal Oaks, CA 95076, which consists of 8 acres, with 7.75 of those acres exposed to storm water. The Facility's general purpose is engaging in the repair and maintenance of commercial trucks and trailers, and the fueling of the same. The Facility operates Monday through Friday, 7:00 a.m. to 5:00 p.m.

80.      The Facility's NOI states that Defendant operates the Facility under Standard Industrial Classification ("SIC") Code 4212, covering establishments primarily engaged in local trucking and storage.

81.      Under SIC Code 4212, the Storm Water Permit requires the Defendant to analyze storm water samples at the Facility for particular parameters, including Total Suspended Solids ("TSS").

82.      Facilities must sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities pollutant source assessment, as required by the Storm Water Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments.  (Storm Water Permit, Section XI.B.6.) The Facility, given its SIC Code of 4212, should be testing for, at a minimum, TSS, oil and grease (O&G), pH, according to the Storm Water Permit.

83.      Plaintiffs are informed and believe, and thereon allege, that industrial activities and corresponding industrial areas at the Facility include: one permanent building that functions as a truck

repair and maintenance shop, and as an office. There are three smaller buildings that function as dispatch and office areas. Additionally, there are eight storage tanks, diesel tanks, a motor oil tank, and one waste oil tank. Six of these tanks hold 10,000 gallons of diesel, one holds 10,000 gallons of motor oil, and one holds 500 gallons of waste oil. Industrial activities at the Facility occur in the following industrial areas of the Facility among others: repair and maintenance of commercial trucks and trailers; fueling of commercial trucks and trailers; occasional storage/stockpile of raw materials; storage of equipment and vehicles; storage of petroleum products; dispensing of petroleum products.

84.     Plaintiffs are informed and believe, and thereon allege, that all industrial activities at the Facility comprise repairing and maintenance of commercial trucks and trailers and fueling of commercial trucks and trailers.

85.     Based on the industrial activities that take place at the Facility, Plaintiffs are informed and believe, and thereon allege, that diesel trucks may leak oil and other fluids and track pollutants on and off the Facility. Plaintiffs are further informed and believe, and thereon allege, that potential pollutants at the Facility include oil and grease and sediment/suspended solids from industrial activities including truck repair within the shop building, fuel dispensing, equipment staging, equipment storage, aggregate stockpile, waste oil transfer, motor oil tank filing, and fuel tank refilling. Plaintiffs are informed and believe, and thereon allege, that the pollutants contact stormwater though contact with onsite containment structures and direct exposure that flows to storm drains.

86.     Plaintiffs are informed and believe, and thereon allege, that the Facility contains two drain areas: DA-1 is the southern drainage area which drains to concrete; DA-2 is the northern drainage area which provides sheet flow to a vegetative buffer. The Facility additionally has two discharge locations: SD-1 is stated to discharge to DA-1; SD-2 discharges to DA-2.

87.     Plaintiffs are informed and believe, and thereon allege, that storm water from the discharge points, flows into the Pajaro River and storm drain inlets and then is conveyed to the County of Monterey storm drain system. The County of Monterey storm drain system flows to Monterey Bay. Monterey Bay and the Pajaro River are waters of the United States.

/ / /

/ / /

88.     Plaintiffs are informed and believe, and thereon allege, that the shortest distance from the Facility to surface water is approximately 1.4 miles; .3 miles southwest Lewis Road and then 1.1 miles north, meeting Pajaro River.

89.     Plaintiffs are informed and believe, and thereon allege, that each of the industrial activities, industrial areas, and industrial materials referenced herein impact and potentially impact stormwater and non-stormwater runoff and discharges at the Facility.

**B.     The Pajaro River Basin.**

90.     The Pajaro River Basin spans four counties and 1,300 square miles. The portion of the Basin pertinent for this action is located within Monterey County. Preservation of natural riparian habitat, and scenic values of the County's streams, creeks, and lakes carry significant importance for the inhabitants of the area.

91.     Monterey County is also home to certain critical habitat designations from the United States Fish and Wildlife Services ("USFWS"), including areas home to central California coast plants (including the Monterey Spineflower, the Robust Spineflower, the Scotts Valley Spineflower, and the Scotts Valley Polygonum), and endangered animals such as the California Tiger Salamander, the Tidewater Goby, the California Red-Legged Frog, the Conservancy Fairy Shrimp, the Olive Ridley Sea Turtle, and the Southern Sea Otter, among other flora and fauna. Over 70,000 acres within the County are designated as critical habitat by the USFWS.

92.     Pollutants from industrial activities, among other threats, can destroy or degrade aquatic habitat essential for breeding and rearing for the species listed in ¶ 98, and other species of concern known to inhabit Monterey County and that depend on surface water, including the Marbled Murrelet, California Clapper Rail, Santa Cruz Long-Toed Salamander, Blue-Nosed Leopard Lizard and Western Snowy Plover.

**C.     The Facility's Storm Water Permit Coverage.**

93.     The Facility's NOI lists the Receiving Water as the Pajaro River, which flows into the Pacific Ocean.  The Pajaro River is a water of the United States within the meaning of the CWA.

94.     The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current Facility Waste Discharge Identification

("WDID") number for the Facility as 3 27I000908. SMARTS lists the Facility coverage under the Storm Water Permit as "Active."

95.     Via search of the SMARTS database, Plaintiffs obtained a SWPPP for the Facility dated June 15, 2015 ("Facility SWPPP").

96.     Plaintiffs are informed and believe, and thereon allege, that the Facility's SWPPP fails to describe and/or adequately describe all of the Facility's industrial activities.

97.     Plaintiffs are informed and believe, and thereon allege, that Facility's Owners/Operators sampled only once in the 2019-2020 reporting year, in violation of the Storm Water Permit.  Indeed, the 2019 – 2020, 2018 – 2019, 2017 – 2018, and 2016 – 2017 Annual Reports filed by or on behalf of Defendant each acknowledge that the Defendant has not sampled the required number of Qualifying Storm Events during the reporting year.

98.     Plaintiffs are informed and believe, and thereon allege, that pollutants associated with the Facility include, but are not limited to  total suspended solids, O&G, and pH.

99.     Plaintiffs are informed and believe, and thereon allege, that without properly identifying all industrial activities or all significant materials at the Facility in the SWPPP, the Defendant has not developed and/or implemented all appropriate BMPs.

100.    Plaintiffs are informed and believe, and thereon allege, that the Facility SWPPP failed to identify, and the Defendant has failed to implement, the minimum BMPs required by the Storm Water Permit, including: sufficient good housekeeping requirements; preventive maintenance requirements; aerial deposition control; material handling and waste management requirements; employee training and quality assurance; and record keeping.

101.    Plaintiffs are informed and believe, and thereon allege, that the Defendant has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the Storm Water Permit's effluent limitations. (Storm Water Permit, Sections X.H.2.)

/ / /

102.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least July 1, 2015.

103.   Plaintiffs are informed and believe, and thereon allege, that violations of TSS, among other constituents, occur each time storm water or non-storm water discharges from the Facility since at least July 1, 2015, in violation of the Storm Water Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

104.   Plaintiffs are informed and believe, and thereon allege, that due to Defendant's recording of averages of testing above NAL exceedances for TSS during the 2015-2016 reporting year, the Facility entered ERA Level 1 for those constituents for the 2015-2016 reporting year. Of grave concern, recorded averages for TSS in the 2015-2016 reporting year were over three times the NAL.

105.   Plaintiffs are informed and believe, and thereon allege, that the repeated and significant exceedances of Benchmark Levels demonstrate that the Defendant has failed and continues to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

106.   Plaintiffs are informed and believe, and thereon allege, that the Defendant has failed and continues to fail to evaluate the effectiveness of the Facility BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in the Facility's storm water discharges.  Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

107.   Plaintiffs are informed and believe, and thereon allege, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

108.   Plaintiffs are informed and believe, and thereon allege, that the Defendant's failure to properly address pollutant sources and pollutants themselves results in the exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted

storm water from the Facility and into local waterways in violation of the Storm Water Permit and/or the CWA.

109. Plaintiffs are informed and believe, and thereon allege, that the Defendant's failure to properly address these pollutants and the pollutant sources results in the exposure of pollutants to precipitation, which carries these pollutants into the Receiving Waters.

**D.    Storm Water Discharges from the Facility.**

110. Pursuant to the Facility SWPPP, there are two main discharge areas. Storm water from the discharge points flows into the Pajaro River and storm drain inlets and then is conveyed to the County of Monterey storm drain system.  The County of Monterey storm drain system flows to Monterey Bay.  Monterey Bay and the Pajaro River are waters of the United States.

111. Except as provided by the Permit, samples shall be collected from each drainage area at all discharge locations. The samples must be a) Representative of storm water associated with industrial activities and any commingled authorized non-storm water discharges; or b) Associated with the discharge of contained storm water.

**E.    The Facility's Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants.**

112. Plaintiffs are informed and believe, and thereon allege, that pollutants from the Facility discharge into Pajaro River, a traditionally navigable water.

113. The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States.  (*See* 40 C.F.R. § 122.2.) The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. (40 C.F.R. § 122.21.)

114. Plaintiffs are informed and believe, and thereon allege, that polluted storm water and non-storm water discharges from the Facility to the Receiving Waters.

/ / /

115.    Storm water discharges containing pollutants, including but not limited to TSS, pH, and O&G, adversely affect the aquatic environment.

116.    Samples of storm water discharges collected at the Facility contain pollutants in excess of levels known to adversely impact aquatic species and the environment, in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations, federal regulations, WQS, and Benchmarks.

117.    Plaintiffs are informed and believe, and thereon allege, that during and/or after every significant rain event[3] or any other storm water or non-storm water discharge that has occurred at the Facility since July 1, 2015, through the present, Defendant has discharged and continues to discharge storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the Benchmarks, CTR, and the WQS.

**F.      Defendant's Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements.**

118.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to develop an adequate MIP for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

119.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance with Section XI of the Storm Water Permit.

120.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to collect or analyze any storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

121.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to sample storm water discharges from all discharge locations, in violation of Sections XI(B) and XI(C) of the Storm Water Permit.

---

[3] A significant rain event is an event that produces stormwater runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

122.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections XI(B) and XI(C) of the Storm Water Permit.

123.    Plaintiffs are informed and believe, and thereon allege, that the Defendant consistently fails to perform, or have performed on its behalf, visual observations of storm water during QSEs.

124.    Plaintiffs are informed and believe, and thereon allege, that Defendant has consistently failed and continues to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted, including: 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance.

125.    Plaintiffs are informed and believe, and thereon allege, that the Defendant did not report its non-compliance as required.

126.    Plaintiffs are informed and believe, and thereon allege, that the Defendant consistently failed, and continues to fail, to collect storm water samples during QSEs.

127.    Information available to Plaintiffs also suggests that the BMPs proffered as implemented in the Facility's SWPPPs are insufficient and ineffective in reducing pollutants to levels compliant with the CWA.

128.    Plaintiffs are informed and believe, and thereon allege, that the Defendant failed, and continues to fail, to submit adequate ERA Reports in recent reporting years to the Regional Board for the Facility with BMP upgrades that meet BAT/BCT, in violation of Section XII(C) of the Storm Water Permit.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

VI.     **CLAIMS FOR RELIEF**.

**FIRST CAUSE OF ACTION**

**Discharges of Contaminated Storm water in Violation of the Storm Water Permit's Effluent**

**Limitations and the Clean Water Act**

**[33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)]**

129.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

130.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

131.    Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility.  Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA.  (*See* Storm Water Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).)

132.    The Defendant violates, and will continue to violate, the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

133.    Plaintiffs are informed and believe, and thereon allege, that the Defendant's violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

134.    Each day since at least July 1, 2015 that the Defendant discharges storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

135.    By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

136.     An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

137.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act**

**[33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)]**

138.     Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

139.     Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

140.     Plaintiffs are informed and believe, and thereon allege, that storm water containing levels of pollutants that cause or contribute to exceedances of WQS has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

141.     The Defendant violates, and will continue to violate, the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

142.     Plaintiffs are informed and believe, and thereon allege, that the Defendant's violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

143.     Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

144.     By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015 to

1   the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40

2   C.F.R. § 19.4.

3        145.    An action for injunctive relief under the CWA is authorized by Section 505(a), 33

4   U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably

5   harm Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which harm they

6   have no plain, speedy, or adequate remedy at law.

7        146.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual

8   controversy exists as to the rights and other legal relations of the Parties.

9                   **THIRD CAUSE OF ACTION**

10   **Defendant's Failure to Adequately Develop, Implement, and/or Revise a Storm Water**

11   **Pollutant Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act**

12   **[33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)]**

13        147.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully

14   set forth herein.

15        148.    Plaintiffs are informed and believe, and thereon allege, that the Defendant has failed

16   and continues to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water

17   Permit.

18        149.    Plaintiffs are informed and believe, and thereon allege, that the Defendant has failed,

19   and continues to fail, to adequately implement the SWPPP for the Facility, in violation of the Storm

20   Water Permit.

21        150.    Plaintiffs are informed and believe, and thereon allege, that the Defendant has failed,

22   and continues to fail, to adequately revise the SWPPP for the Facility, in violation of the Storm Water

23   Permit.

24        151.    The Defendant has been in violation of the Storm Water Permit at the Facility every

25   day from July 1, 2015 to the present.

26        152.    The Defendant's violations of the Storm Water Permit and the CWA at the Facility are

27   ongoing and continuous.

28   / / /

153.    The Defendant will continue to be in violation of the Storm Water Permit and the CWA each and every day the Defendant fails to adequately develop, implement, and/or revise the SWPPP for the Facility.

154.    Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

155.    By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

156.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

157.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**FOURTH CAUSE OF ACTION**

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Plan in Violation of the Storm Water Permit and the Clean Water Act**

**[U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)]**

158.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

159.    Plaintiffs are informed and believe, and thereon allege, that the Defendant has failed, and continues to fail, to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

160.    Plaintiffs are informed and believe, and thereon allege, that the Defendant has failed, and continues to fail, to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

/ / /

161.    Plaintiffs are informed and believe, and thereon allege, that the Defendant has failed, and continues to fail, to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

162.    The Defendant has been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from July 1, 2015, to the present.

163.    The Defendant's violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

164.    The Defendant will continue to be in violation of Section XI of the Storm Water Permit, and the CWA, each and every day it fails to adequately develop, implement, and/or revise an MIP for the Facility.

165.    Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

166.    By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

167.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

168.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FIFTH CAUSE OF ACTION

**Defendants' Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act**

**[33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)]**

169.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

170.    Plaintiffs are informed and believe, and thereon allege, that the Defendant has failed, and continues to fail, to sufficiently sample and analyze storm water in violation of Section XI(B)(2) and (B)(6) of the Storm Water Permit

171.    Plaintiffs are informed and believe, and thereon allege, that the Defendant has failed, and continues to fail, to submit accurate Annual Reports to the Regional Board, in violation of Sections XI and XVI of the Storm Water Permit.

172.    Plaintiffs are informed and believe, and thereon allege, that the Defendant has failed, and continues to fail, to submit adequate ERA Reports to the Regional Board for the Facility with BMP upgrades that meet BAT/BCT, in violation of Section XII(C) of the Storm Water Permit.

173.    Plaintiffs are informed and believe, and thereon allege, that the Defendant's Annual Reports failed, and continue to fail, to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Sections XI and XVI of the Storm Water Permit.

174.    Plaintiffs are informed and believe, and thereon allege, that the Defendant has failed, and continues to fail, to submit complete Annual Reports to the Regional Board, in violation of Sections XI and XVI of the Storm Water Permit.

175.    The Defendant has been in violation of Sections XI, XII and XVI of the Storm Water Permit since July 1, 2015.

176.    The Defendant has been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Facility without reporting as required by Sections XI, XII(C) and XVI of the Storm Water Permit.

177.    The Defendant has been in violation of Sections XI, XII(C) and XVI of the Storm Water Permit since at least July 1, 2015.

178.    The Defendant's violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

179.    By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

180.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

181.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## VII.    RELIEF REQUESTED.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a.      A Court Order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.      A Court Order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.      A Court Order assessing civil monetary penalties for each violation of the CWA occurring prior to November 2, 2015 at $37,500 per day per violation, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

d.      A Court Order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per violation per day, pursuant to Sections 309(d) and 505 of the CWA occurring after December 6, 2013 through November 2, 2015, and $55,800 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after January 13, 2020.  (See 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.)

e.      A Court Order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.      Any other relief as this Court may deem appropriate.

## VIII.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial in this matter.

Dated: November 20, 2020                    AQUA TERRA AERIS LAW GROUP

                                            By:        s/Anthony M. Barnes
                                            Anthony M. Barnes
                                            Attorneys for Plaintiffs CALIFORNIA
                                            COASTKEEPER, INC., dba
                                            CALIFORNIA COASTKEEPER ALLIANCE,
                                            and THE OTTER PROJECT, INC., for itself and
                                            for MONTEREY COASTKEEPER, a program of
                                            THE OTTER PROJECT, INC.


Dated: November 20, 2020                    CALIFORNIA COASTKEEPER ALLIANCE

                                            By:        s/Erin K. Clancy
                                            Erin K. Clancy
                                            Attorneys for Plaintiffs CALIFORNIA
                                            COASTKEEPER, INC., dba
                                            CALIFORNIA COASTKEEPER ALLIANCE,
                                            and THE OTTER PROJECT, INC., for itself and
                                            for MONTEREY COASTKEEPER, a program of
                                            THE OTTER PROJECT, INC.

COMPLAINT

# EXHIBIT A



August 15, 2020

**<u>VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED</u>**

Kelvin Hildebrand                                      Theron Hildebrand
Hildebrand & Sons Trucking, Inc.              Hildebrand & Sons Trucking, Inc.
President & Agent for Service of Process     Secretary
6 Lewis Road                                            118 Roger Ave.
Royal Oaks, CA 95076                             Watsonville, CA 95076

RE:   **NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE
FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT")
(33 U.S.C. §§ 1251 *et seq.*)**

Dear Mr. Kelvin Hildebrand and Mr. Theron Hildebrand:

This firm represents California Coastkeeper, Inc., doing business as California Coastkeeper
Alliance ("Coastkeeper Alliance"), The Otter Project, Inc. and Monterey Coastkeeper, a program
of The Otter Project, Inc., in regard to violations of the Clean Water Act ("CWA") occurring at
the Hildebrand & Sons Trucking, Inc. industrial facility located at 6 Lewis Road, Royal Oaks,
California 95076 (the "Facility") with Waste Discharger Identification Number WDID 3
27I000908. The Facility primarily engages in the repair and maintenance of commercial trucks
and trailers, and fuels commercial trucks and trailers. This letter is being sent to you as the
responsible owners, officers, and/or operators of the Facility. Unless otherwise noted, Hildebrand
& Sons Trucking, Inc., shall hereinafter be referred to as "Hildebrand" and Kelvin Hildebrand
and Theron Hildebrand shall collectively be referred to as the "Owners/Operators."

Coastkeeper Alliance is a non-profit public benefit water advocacy organization dedicated to
protecting California's coasts and oceans. The Otter Project, Inc. is a non-profit public benefit
organization working to protect our watersheds and coastal oceans for the benefit of California
sea otters and humans through science-based policy and advocacy. Monterey Coastkeeper is
program of the Otter Project, Inc., and a participant in the Coastkeeper Alliance. Collectively
herein, these three organizations shall be referred to as ("Coastkeeper & The Otter Project").
Members of these organizations live and recreate near to and in the Pajaro River and Monterey
Bay ("Receiving Waters") into which Hildebrand discharges polluted stormwater. As explained
in detail below, Hildebrand continuously discharges pollutants into the Receiving Waters, in
violation of the CWA and the Storm Water Permit or General Permit. Coastkeeper & The Otter
Project's members, among other activities, fish, kayak, boat, birdwatch, picnic, hike, bike,
recreate, relax and enjoy the wildlife in and around the Pajaro River and Monterey Bay,
including the wetlands adjacent to the mouth of the Pajaro River, the Pajaro Dunes and
Zmudowski State Beach. Additionally, the members use the Receiving Waters to engage in



scientific study through pollution and habitat monitoring to promote restoration activities. The unlawful discharge of pollutants from the Facility into the Receiving Waters impairs the Coastkeeper & The Otter Project's members' use and enjoyment of these waters. Thus, the interests of the members have been, are being, and will continue to be adversely affected by Hildebrand's failure to comply with the Clean Water Act and the Storm Water Permit.

Hildebrand is in ongoing violation of the substantive and procedural requirements of the CWA, 33 U.S.C. § 1251 *et seq.*; and California's General Industrial Storm Water Permit, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 Water Quality Order No. 2015-0057-DWQ, and as recently amended by Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use (collectively "General Permit" or "Permit").[1]

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects Hildebrand to a penalty for all violations occurring during the period commencing five years prior to the date of this Notice Letter. These provisions of law authorize civil penalties of $37,500 per day per violation for all CWA violations after January 12, 2009 and $ 55,800.00 per day per violation for violations that occurred after November 2, 2015. In addition to civil penalties, the Coastkeeper & The Otter Project will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) of the Act (33 U.S.C. §§ 1365(a), (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

The CWA requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. 135.2.

As required by the CWA, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility. 40 C.F.R. § 135.3(a). At the expiration of sixty (60) days from the date of this letter, the Coastkeeper & The Otter Project intend to file suit under Section 505(a) of the Act (33 U.S.C. § 1365(a)) in federal court against Hildebrand for violations of the CWA and the General Permit. If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next twenty-five (25) days so that they may be completed before the end of the 60-day notice period.

---

[1] Hildebrand submitted its most recent Notice of Intent to comply with the General Permit for the Facility on or about June 9, 2015.

CWA Notice of Intent to Sue
Hildebrand & Sons Trucking, Inc.
August 15, 2020
Page 3 of 13



## I.      Background

### A.      The Clean Water Act

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Baykeeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002). The Act is administered largely through the NPDES permit program. 33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating stormwater discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of stormwater runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants without a NPDES permit, or in violation of a NPDES permit, is illegal. *Ecological Rights Found. v. Pac. Lumber Co*., 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program).  The CWA authorizes states with approved NPDES permit programs to regulate industrial stormwater discharges through individual permits issued to dischargers, as well as through the issuance of a single, statewide general permit applicable to all industrial stormwater dischargers. 33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board Water Resource Control Board ("State Board") to issue individual and general NPDES permits in California. 33 U.S.C. § 1342. The Board coordinates with the Central Coast Regional Water Quality Control Board ("Regional Board"), which has shared jurisdiction over the Facility for state and federal water pollution control efforts.

### B.      California's General Permit for Storm Water Discharges Associated with Industrial Activities

Facilities discharging, or having the potential to discharge, stormwater associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI"). Facilities must strictly comply with all of the terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements. Under the General Permit Facilities must submit Exceedance Response Action Plans ("ERA Report") to the State Board outlining effective plans to reduce pollutants if a Facility reports a pollutant above the Numeric Action Level ("NAL"). An annual NAL



exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year[2] exceed the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. General Permit XII.A.

### C.     Hildebrand's Industrial Facility

Hildebrand's Facility is located on 6 Lewis Road, Royal Oaks, California. The Facility primarily engages in repair and maintenance of commercial trucks and trailers, and fuels commercial trucks and trailers. Pursuant to the Facility's Notice of Intent to comply with the General Permit, the Facility encompasses 8 acres, with 7.75 acres exposed to stormwater. Scheduled facility operating hours are Monday through Friday, 7:00 AM to 5:00 PM. The shortest distance from the Facility to surface water is approximately 1.4 miles; .3 miles southwest Lewis Road and then 1.1 miles north, meeting the Pajaro River.

According to The Facility's Notice of Intent to Comply with the General Permit ("NOI") and Storm Water Pollution Prevention Plan ("SWPPP") Hildebrand operates under Standard Industrial Classification (SIC) Code 4212, covering establishments primarily engaged in local trucking and storage. Under this SIC Code 4212, the General Permit requires Hildebrand to analyze stormwater samples for particular parameters, including total suspended solids ("TSS"). Facilities must also sample and analyze for additional parameters identified on a facility specific basis to reflect pollutant source assessment, due to receiving water impairments, or as required by the Regional Board.

The Facility has one permanent building that functions as a truck repair and maintenance shop and as an office. There are three smaller buildings that function as dispatch and office areas. Additionally, there are eight storage tanks, diesel tanks, a motor oil tank, and one waste oil tank. Six of these tanks hold 10,000 gallons of diesel, one holds 10,000 gallons of motor oil, and one holds 500 gallons of waste oil. Industrial activities at the Facility occur in the following industrial areas of the Facility among others: repair and maintenance of commercial trucks and trailers; fueling of commercial trucks and trailers; occasional storage/stockpile of raw materials; storage of equipment and vehicles; storage of petroleum products; dispensing of petroleum products.

Industrial activities at the Facility include repairing and maintenance of commercial trucks and trailers, and fuels commercial trucks and trailers. Diesel trucks may leak oil and other fluids and track pollutants on and off the Facility, including dust, debris and sediment. Potential pollutants at the Facility include settled and wind-blown dust and debris, oil and grease and sediment/suspended solids from industrial activities including truck repair, fuel dispensing, equipment staging, equipment storage, aggregate stockpile, waste oil transfer, motor oil tank

---

[2] A reporting year under the General Permit is July 1 to June 30.

CWA Notice of Intent to Sue
Hildebrand & Sons Trucking, Inc.
August 15, 2020
Page 5 of 13



filing, and fuel tank refilling. The pollutants contact stormwater though contact with onsite containment structures and direct exposure that flows to storm drains.

The Facility features two drain areas. Drainage Area 1 ("DA-1") is the southern drainage area and stormwater drains to and then through a concrete v-gutter which joins a culvert at the southwestern corner of the property; DA-2 is the northern drainage area which discharges stormwater via sheet flow to Lewis Road. Accordingly, the Facility has two discharge locations. DA-1 discharges to SD-1 at the culvert, and DA-2 discharges to SD-2 via sheet flow to Lewis Road. However, while the Owners/Operators collected and analyzed stormwater samples from SD-2 in the 2015-2016 reporting year, those results were not been uploaded to the State Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") database via Ad Hoc reports and are only available in the corresponding laboratory reports which are uploaded to SMARTS. Since the 2015-2016 reporting years, the lab reports have not been uploaded to SMARTS, and it is unknown to Coastkeeper & The Otter Project if samples were collected from SD-2. A storm drain on Lewis Road is clearly visible from satellite imagery. Coastkeeper & The Otter Project will seek this information should this matter proceed into active litigation and penalties will be sought for any additional violations of the Benchmarks detailed below.

## II.     Hildebrand's Violations of the Act and the General Permit

Based on its review of available public documents, the Coastkeeper & The Otter Project are informed and believe that Hildebrand is in ongoing violation of both the substantive and procedural requirements of the CWA, and the General Permit. These violations are ongoing and continuous. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the CWA, Hildebrand is subject to penalties for violations of the Act since August 15, 2015. As mentioned above, Coastkeeper & The Otter Project expect to identify additional stormwater discharges conveying pollutants to the Receiving Waters in violation of the CWA through further investigation of the Facility and as this matter progresses through the rainy season.

### A.     Hildebrand Discharges Storm Water Containing Pollutants in Violation of the General Permit's Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations

Hildebrand's stormwater sampling results provide conclusive evidence of its failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations. Self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

#### 1.     Applicable Water Quality Standards

The General Permit requires that stormwater discharges and authorized non-stormwater discharges shall not cause or threaten to cause pollution, contamination, or nuisance. The



General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Board's Basin Plan or statewide water quality control plans and policies. Furthermore, stormwater discharges and authorized non-stormwater discharges shall not adversely impact human health or the environment and shall not cause or contribute to a violation of any water quality standards in any affected receiving water. General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that stormwater discharges are in violation of the General Permit's Receiving Water Limitations. The documentation must describe changes the discharger will make to its current stormwater best management practices ("BMPs") in order to prevent or reduce any pollutant in its stormwater discharges that is causing or contributing to an exceedance of water quality standards. *Id*.

The *Water Quality Control Plan for the Central Coastal Basin* ("Basin Plan") also sets forth water quality standards and prohibitions applicable to Hildebrand's stormwater discharges. The Basin Plan identifies existing and potential Beneficial Uses for water bodies, such as the Monterey Bay, and contact and non-contact water recreation, wildlife habitat, estuarian habitat, spawning, and shellfish harvesting. Basin Plan, Chapter 3.3.2.

## 2. Applicable Effluent Limitations

Dischargers are required to reduce or prevent pollutants in their stormwater discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. 40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial stormwater has implemented the requisite BAT and BCT. *Santa Monica Baykeeper v. Kramer Metals,* 619 F.Supp.2d 914, 920, 923 (C.D. Cal 2009). General Permit, Exceedance Response Action XII.A.

The following EPA benchmarks have been established for pollutants discharged by Hildebrand: total suspended solids—100 mg/L; nitrate plus nitrite nitrogen —0.68 mg/L, copper 0.0123 mg/L, Oil & Grease—15 mg/L, Iron— 1 mg/L, and pH—6-9 s.u.

## 3. Hildebrand's Storm Water Sample Results

As detailed above, Hildebrand's SWPPP identifies two main discharge areas. Stormwater from DA-1 flows discharges from the Facility into a culvert that is thought to drain onto Lewis Road and into the Monterey County Municipal Separate Storm Sewer System ("MS4") which empties to the Pajaro River. Stormwater from DA-2 sheet flows onto Lewis Road and into the Monterey

CWA Notice of Intent to Sue
Hildebrand & Sons Trucking, Inc.
August 15, 2020
Page 7 of 13



County MS4 which empties into the Pajaro River. The Pajaro River flows to Monterey Bay. Monterey Bay and the Pajaro River are waters of the United States.

Except as provided by the Permit, samples shall be collected from each drainage area at all discharge locations. The samples must be: a) Representative of stormwater associated with industrial activities and any commingled authorized non-stormwater discharges; or, b) Associated with the discharge of contained stormwater.

The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations, and effluent limitations of the Permit.

**a. Discharges of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) | Discharge Point |
|---|---|---|---|---|
| 3/20/2018 | TSS | 570 | 100 | SD-1/Culvert at V-Gutter |
| 1/8/2018 | TSS | 180 | 100 | SD-1/Culvert at V-Gutter |
| 10/28/2016 | TSS | 120 | 100 | SD-1/Culvert at V-Gutter |
| 1/5/2016 | TSS | 370 | 100 | SD-1/Culvert at V-Gutter |
| 1/5/2016 | TSS | 250 | 100 | SD-2/Sheet flow to Lewis Rd. |
| 12/11/2015 | TSS | 560 | 100 | SD-1/Culvert at V-Gutter |
| 12/11/2015 | TSS | 170 | 100 | SD-2/Sheet flow to Lewis Rd. |
| 11/2/2015 | TSS | 250 | 100 | SD-1/Culvert at V-Gutter |
| 11/2/2015 | TSS | 350 | 100 | SD-2/Sheet flow to Lewis Rd. |

Hildebrand's sample results demonstrate violations of the General Permit's discharge prohibitions, receiving water limitations, and effluent limitations set forth above. The Coastkeeper & The Otter Project are informed and believe that Hildebrand has known that its stormwater contains pollutants at levels exceeding General Permit standards since at least August 15, 2015.

Coastkeeper & The Otter Project allege that such violations occur each time stormwater or non-stormwater discharges from the Facility. Attachment A hereto, sets forth the specific rain dates on which the Coastkeeper & The Otter Project allege that Hildebrand has discharged stormwater containing impermissible levels of impermissible levels of total suspended solids and other pollutants in violation of the General Permit.

Because Hildebrand recorded averages of testing above Numeric Action Levels exceedances for total suspended solids during the 2015-2016, the Facility entered ERA Level 1 for those constituents for the 2015-2016 reporting year. Recorded an average for total suspended solids in the 2015-2016 reporting year was over 2.8 times the NAL. In the 2017-2018 reporting year, Hildebrand recorded average for total suspended solids was over 3.7 times the NAL. IN the



2018-2019 reporting year, no samples appear to have been taken and analyzed. Because Hildebrand recorded an average above the NAL for total suspended solids in both the 2015-2016 and the 2017-2018 years, an ERA Report should have been uploaded to SMARTS and improved BMPs should have been implemented. While a four-page ERA Report is available for the 2015-2016 with minimal BMP suggestions, no ERA Report is available for the 2017-2018 reporting year.

### 4.      Hildebrand Has Failed to Implement BAT and BCT

Dischargers must implement adequate BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their stormwater discharges. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. Sampling results of orders of magnitude in excess of benchmark levels, as reported by Hildebrand, are evidence that Hildebrand does not have BMPs that achieve BAT/BCT (*Santa Monica Baykeeper v. Kramer Metals, Inc.* 619 F. Supp. 2d 914. 925 (C.D. Cal., 2009.)

Hildebrand has failed to implement the minimum BMPs required by the General Permit, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. General Permit, Sections X.H.1(a–g).

Hildebrand has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its stormwater sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. There are no advanced BMPs currently in use at the Facility. General Permit, Sections X.H.2.

Each day the Owners/Operators have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA (33 U.S.C. § 1311(a)). The violations described above were at all times in violation of the General Permit. Accordingly, the Owners/Operators have been in violation of the BAT and BCT requirements at the Facility every day since at least August 15, 2015.

### 5.      Hildebrand Has Failed to Develop and Implement an Adequate Storm Water Pollution Plan

The General Permit requires dischargers to develop and implement a site-specific SWPPP. General Permit, Section X.A. The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum



BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. *See id.*

Dischargers must revise the Facility's SWPPP whenever necessary, and certify and submit on the State Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS any non-significant revisions not more than once every three (3) months in the reporting year. General Permit, Section X.B

Last, the General Permit requires a permittee whose discharges violate the General Permit's Receiving Water Limitations to implement additional BMPs or other control measures, in order to attain compliance with the receiving water limitation identifying what additional BMPs will be implemented to achieve water quality standards, along with an implementation schedule, which would then be incorporated into the Facility SWPPP. Coastkeeper & The Otter Project's investigation indicates that Hildebrand has been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements since at least August 15, 2015 and that the Owners/Operators failed to implement sufficient BMPs as required by the General Permit. Hildebrand's SWPPP is dated June 15, 2015 and has not been updated since that time. Hildebrand has failed to sufficiently evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's unlawful effluent limitation violations. The Facility's ERA Report dated December 16, 2016 indicated that only updated housekeeping BMPs were implemented in November 2016. Exceedances have continued as demonstrated through the self-reported sampling results. Due to the lack of sampling over the past five years, Coastkeeper & The Otter Project suspect other violations would have been self-reported given the 189 total days of precipitation of over 0.1 inch measured at a nearby weather gauge over the past five years. *See* Attachment A. As such, the Owners and/or Operators are in daily violation of this requirement of the General Permit.

Each day the Owners/Operators failed to develop and implement an adequate SWPPP is a violation of the General Permit. The SWPPP violations described above were at all times in violation of the General Permit. The Owners/Operators have been in violation of these requirements at the Facility every day since at least August 15, 2015.

### 6.    Hildebrand has Failed to Develop, Implement, and/or Revise an Adequate Monitoring Implementation Plan

Section X.I of the General Permit requires Facility Owners/Operators to develop and implement an adequate Monitoring Implementation Plan ("MIP"). The primary objective of the monitoring and reporting plan is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. General Permit Fact Sheet, Section II.J(1). Monitoring undertaken must therefore determine whether pollutants are being discharged, and whether



response actions are necessary, and must evaluate the effectiveness of BMPs. *See* General Permit, Section I.J(56).

Section XI.A of the Permit requires dischargers to visually observe and collect samples of stormwater from all locations where stormwater is discharged. Under Section XI.B of the Permit, the Facility Owners/Operators are required to collect at least two (2) samples from each discharge location at their Facility during the first half of the reporting year, and then again during the second half of the reporting year. Storm water samples must be analyzed for total suspended solids, pH, oil & gas, and other pollutants that are likely to be present in the Facility's discharges in significant quantities, and as required under the General Permit pursuant to a Facility SIC Code. *See* General Permit, Section XI.B(6).

The Facility Owners/Operators have been conducting operations at the Facility with an inadequately developed, implemented, and/or revised MIP. Upon information and belief, the Facility Owners/Operators only sampled stormwater three times during the 2016-2017 reporting year, two times during 2017-2018 reporting year, zero times during 2018-2019 reporting year, and once during 2019-2020 reporting year in violation of Section XI.B of the Permit, despite ample stormevents in each of those years. *See* Attachment A. In each of the above reporting years the Facility Owner/Operators claimed in their Annual Report there were not enough qualifying storm events, except for in the 2018-2019 reporting year, where no sample results were uploaded to SMARTS and no Annual Report is available. Further, no samples appear to have been collected or analyzed from SD-2, the sheet flow stormwater discharge onto Lewis Road. With the recorded storm events identifies in Attachment A, Coastkeeper & The Otter Project believe that stormwater is without doubt discharging from the Facility and thus should be sampled and analyzed with the results uploaded to SMARTS.

The Facility Owners'/Operators' failure to conduct sampling and monitoring as required by the General Permit demonstrates that it has failed to develop, implement, and/or revise an MIP that complies with the requirements Section XI of the General Permit. Every day that the Facility Owners/Operators conduct operations in violation of the specific monitoring requirements of the General Permit, or with an inadequately developed and/or implemented MIP, is a separate and distinct violation of the General Permit, and the CWA. The Facility Owners/Operators have been in daily and continuous violation of the General Permit's MIP requirements every day since at least August 15, 2015. These violations are ongoing, and Coastkeeper & The Otter Project will include additional violations when information becomes available, including continuing violations of the General Permit monitoring requirements. *See* General Permit, Section XI. The Facility Owners/Operators are subject to civil penalties for all violations of the Clean Water Act occurring since August 15, 2015.

### 7. Failure to Comply with the Storm Water Permit's Reporting Requirements

Section XVI of the General Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. The requirements include a compliance checklist, an



affirmation of visual observations and sampling results, an explanation for any non-compliance of requirements within the reporting year, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year; and, the date(s) of the Annual Evaluation. Sampling results must be input into the SMARTS database shortly after receipt of the lab reports of sample analysis. The lab reports must also be uploaded into the SMARTS portal. As mentioned above an annual Report for the 2018-2019 reporting year is not available on SMARTS, and there are no sampling results available for that reporting year either. The Facility Owners/Operators have submitted other annual reports past the deadline. Thus, information available to Coastkeeper & The Otter Project suggests, that the Facility Owners/Operators have violated the procedural requirements of Section XVI of the General Permit.

Last, information available to the Coastkeeper & The Otter Project indicates that the Facility Owners/Operators have failed to accurately report their non-compliance with the General Permit and correctly report stormwater sampling analysis compliance in the Facility's Annual Reports. Further, the Facility ERA Report resulting from samples recorded in the 2015-2016 did not call for sufficient implementation of BMPs, and despite stormwater heavily polluted with total suspended solids well in excess of the NAL in the 2017-2018 reporting year, no ERA Report was submitted to SMARTS, and no revisions were made to the SWPPP to include additional BMPs, in violation of the General Permit. As such, the Owners/Operators are in daily violation of the General Permit. Every day the Facility Owners/Operators conduct operations at the Facility without reporting as required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Facility Owners/Operators have been in daily and continuous violation of the General Permit's monitoring and reporting requirements every day since at least August 15, 2015. These violations are ongoing, and the Coastkeeper & The Otter Project will include additional violations when information becomes available.

## III.    Persons Responsible for the Violations

The Coastkeeper & The Otter Project put Hildebrand on notice that it is the entity responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, the Coastkeeper & The Otter Project put Hildebrand on formal notice that it intends to include those persons in this action.

## IV.    Name and Address of Noticing Party

The name, mailing address, and telephone number of the noticing party is as follows:

California Coastkeeper Alliance
Erin Clancy, Staff Attorney
1100 11th Street, 3rd Floor
Sacramento, CA 95814

CWA Notice of Intent to Sue
Hildebrand & Sons Trucking, Inc.
August 15, 2020
Page 12 of 13



> Monterey Coastkeeper & The Otter Project
> Steve Shimek
> Program Manager, Monterey Coastkeeper
> CEO, The Otter Project
> P.O. Box 269
> Monterey, CA 93942

## V.      Counsel

Coastkeeper & The Otter Project have retained legal counsel to represent it in this matter. Please direct all communications to:

> Anthony M. Barnes
> Jason R. Flanders
> Aqua Terra Aeris Law Group
> 4030 Martin Luther King Jr. Way
> Oakland, CA 94609
> 917-371-8293

## VI.     Conclusion

Coastkeeper & The Otter Project believe this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the CWA against Hildebrand and its agents for the above-referenced violations upon the expiration of the 60-day notice period, unless Hildebrand and Coastkeeper & The Otter Project agree to formally extend this notice period in light of ongoing pandemic. Again, if you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next twenty-five (25) days so that they may be completed before the end of the 60-day notice period.

Sincerely,

Anthony M. Barnes
Jason R. Flanders
ATA Law Group
Counsel for California Coastkeeper Alliance,
The Otter Project, and Monterey Coastkeeper

CWA Notice of Intent to Sue
Hildebrand & Sons Trucking, Inc.
August 15, 2020
Page 13 of 13



## SERVICE LIST

*VIA US MAIL*

William Barr
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Mike Stoker
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Andrew Wheeler
Administrator
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460 (1101A)

John M. Robertson, Executive Officer
Central Coast Regional Water Quality Control
Board
895 Aerovista Place, Suite 101
San Luis Obispo, CA 93401-7906

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812-0100

ATTACHMENT A

Days with Precipitation
above 0.10 Inch

| STATION | NAME | DATE | PRCP |
|---------|------|------|------|
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/2/2015 | 1.45 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/8/2015 | 0.39 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/9/2015 | 0.38 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/15/2015 | 0.48 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/24/2015 | 0.31 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/3/2015 | 0.39 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/10/2015 | 0.72 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/11/2015 | 0.14 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/13/2015 | 0.57 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/19/2015 | 0.23 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/21/2015 | 1.64 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/22/2015 | 0.43 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/24/2015 | 0.19 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/4/2016 | 0.15 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/5/2016 | 1.04 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/6/2016 | 1.21 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/7/2016 | 0.17 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/13/2016 | 0.3 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/14/2016 | 0.18 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/16/2016 | 0.17 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/17/2016 | 0.48 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/18/2016 | 0.83 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/19/2016 | 1.39 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/22/2016 | 0.91 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/23/2016 | 0.22 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/29/2016 | 0.33 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/31/2016 | 0.35 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/17/2016 | 0.51 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/18/2016 | 0.11 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/4/2016 | 0.34 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/5/2016 | 2.98 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/6/2016 | 0.78 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/7/2016 | 0.92 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/11/2016 | 0.57 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/12/2016 | 0.12 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/13/2016 | 1.57 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/21/2016 | 0.18 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/8/2016 | 0.21 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/10/2016 | 0.23 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 5/6/2016 | 0.13 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/19/2016 | 0.68 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/20/2016 | 0.35 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/26/2016 | 0.51 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/27/2016 | 0.22 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/8/2016 | 1.17 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/10/2016 | 1.11 |

ATTACHMENT A

Days with Precipitation
above 0.10 Inch

| STATION | NAME | DATE | PRCP |
|---------|------|------|------|
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/15/2016 | 2.41 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/23/2016 | 0.58 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/2/2017 | 0.16 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/3/2017 | 1.56 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/4/2017 | 0.96 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/7/2017 | 1.76 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/8/2017 | 1.52 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/9/2017 | 0.39 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/10/2017 | 0.88 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/12/2017 | 0.48 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/18/2017 | 1.23 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/19/2017 | 0.19 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/20/2017 | 1.74 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/21/2017 | 0.24 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/22/2017 | 1.86 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/23/2017 | 0.36 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/2/2017 | 0.72 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/3/2017 | 0.28 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/4/2017 | 0.2 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/5/2017 | 0.59 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/6/2017 | 0.87 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/7/2017 | 0.6 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/8/2017 | 0.26 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/9/2017 | 1.54 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/10/2017 | 0.3 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/16/2017 | 0.46 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/17/2017 | 1.02 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/19/2017 | 0.15 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/20/2017 | 2.5 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/21/2017 | 0.19 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/4/2017 | 0.41 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/5/2017 | 0.11 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/20/2017 | 0.81 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/21/2017 | 0.76 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/22/2017 | 0.99 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/24/2017 | 0.6 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/25/2017 | 0.2 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/6/2017 | 0.36 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/7/2017 | 0.93 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/8/2017 | 0.12 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/11/2017 | 0.13 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/12/2017 | 0.17 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/13/2017 | 0.53 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/16/2017 | 0.45 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/17/2017 | 0.23 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/9/2017 | 0.22 |

ATTACHMENT A

Days with Precipitation
above 0.10 Inch

| STATION | NAME | DATE | PRCP |
|---------|------|------|------|
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/16/2017 | 1.11 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/26/2017 | 0.47 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/27/2017 | 0.12 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/20/2017 | 0.14 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/3/2018 | 0.6 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/8/2018 | 1.88 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/9/2018 | 0.49 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/18/2018 | 0.14 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/1/2018 | 0.75 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/12/2018 | 0.17 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/13/2018 | 0.61 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/14/2018 | 0.17 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/15/2018 | 0.49 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/16/2018 | 0.72 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/20/2018 | 0.65 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/21/2018 | 1.09 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/22/2018 | 0.54 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/6/2018 | 0.68 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/7/2018 | 1.05 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/16/2018 | 0.3 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 10/3/2018 | 0.12 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/21/2018 | 0.41 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/22/2018 | 0.26 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/23/2018 | 1.71 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/28/2018 | 0.91 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/29/2018 | 0.71 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/1/2018 | 0.19 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/4/2018 | 0.21 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/16/2018 | 1.19 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/17/2018 | 0.72 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/24/2018 | 0.43 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/5/2019 | 0.21 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/6/2019 | 1.69 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/9/2019 | 0.41 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/11/2019 | 0.27 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/15/2019 | 1.37 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/16/2019 | 0.77 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/20/2019 | 0.24 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/31/2019 | 0.72 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/1/2019 | 0.16 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/2/2019 | 1.57 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/3/2019 | 0.32 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/4/2019 | 0.9 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/8/2019 | 0.82 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/9/2019 | 0.44 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/10/2019 | 0.35 |

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/13/2019 | 1.26 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/14/2019 | 0.73 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/15/2019 | 0.54 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/16/2019 | 0.16 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/17/2019 | 0.17 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 2/27/2019 | 0.38 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/2/2019 | 1.54 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/3/2019 | 0.15 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/5/2019 | 0.25 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/6/2019 | 0.96 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/8/2019 | 0.11 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/9/2019 | 0.65 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/10/2019 | 0.57 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/20/2019 | 0.56 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/23/2019 | 0.35 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/25/2019 | 0.16 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/27/2019 | 0.48 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/5/2019 | 0.18 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 5/15/2019 | 0.56 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 5/16/2019 | 0.14 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 5/18/2019 | 0.59 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 5/19/2019 | 0.76 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/26/2019 | 0.43 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/27/2019 | 0.58 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 11/30/2019 | 0.85 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/1/2019 | 2.58 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/2/2019 | 1.72 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/3/2019 | 0.15 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/4/2019 | 1.36 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/7/2019 | 0.43 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/8/2019 | 0.26 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/18/2019 | 0.6 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/22/2019 | 0.8 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/25/2019 | 0.35 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 12/29/2019 | 0.3 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/9/2020 | 0.27 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/16/2020 | 1.36 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/21/2020 | 0.11 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/22/2020 | 0.13 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 1/26/2020 | 0.11 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/7/2020 | 0.23 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/14/2020 | 2.52 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/15/2020 | 1.33 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/16/2020 | 0.44 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 3/24/2020 | 0.7 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/4/2020 | 0.17 |

ATTACHMENT A

Days with Precipitation
above 0.10 Inch

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/5/2020 | 2.71 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 4/6/2020 | 0.23 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 5/11/2020 | 0.17 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 5/17/2020 | 0.18 |
| USW00023277 | WATSONVILLE MUNICIPAL AIRPORT, CA US | 5/18/2020 | 0.39 |